IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


MARTI JEAN K.,[1]

              Plaintiff,

     v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

              Defendant.

No. 6:18-cv-00109-HZ

OPINION & ORDER


Katherine L. Eitenmiller
Brent Wells
HARDER, WELLS, BARON & MANNING, P.C.
474 Willamette Street
Eugene, OR 97401

     Attorneys for Plaintiff

Renata Gowie
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

L. Jamala Edwards
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

     Attorneys for Defendant

HERNANDEZ, District Judge:

     Plaintiff Marti Jean K. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). The Court reverses and remands the Commissioner's decision for further proceedings.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB and SSI on February 10, 2014, and November 3, 2015, alleging onset dates of January 9, 2014, and August 23, 2013, respectively. Tr. 79, 182.[2] Her application was denied initially and on reconsideration. Tr. 110–14, 120–24

     On October 17, 2016, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 38. At the hearing, Plaintiff amended her alleged onset date to September 1, 2014. Tr. 45. On December 8, 2016, the ALJ found Plaintiff not disabled. Tr. 32. The Appeals Council denied review. Tr. 1.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on multiple sclerosis; visual disturbances, including loss of vision, double vision, and blurred vision; neuropathy; chronic pain and weakness;

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative

fibromyalgia; cognitive problems; depression; anxiety; migraines; and "abnormal brain mri's." Tr. 241. At the time of the hearing, she was 46 years old. Tr. 30. She has a high school education and some additional coursework, tr. 49, and she has past relevant work experience as a home attendant and insurance clerk/receptionist, tr. 30.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141;

record, filed herein as Docket No. 10.

20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if

not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any

impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20

C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant

is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the

Commissioner. In step five, the Commissioner must establish that the claimant can perform

other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If

the Commissioner meets his burden and proves that the claimant is able to perform other work

which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566,

416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity after her amended alleged onset date of September 1, 2014. Tr. 23. Next, at steps two

and three, the ALJ determined that Plaintiff has the following severe impairments: "multiple

sclerosis (MS), fibromyalgia, and depressive disorder." Tr. 24. However, the ALJ determined

that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment.

Tr. 25. At step four, the ALJ concluded that Plaintiff has the residual functional capacity to

perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) with the following

limitations:

> [T]he claimant can lift and carry 20 pounds occasionally, and 10 pounds
> frequently. She can stand and walk 4 hours in an 8 hour day, and sit for 6 hours in
> an 8 hour day. The claimant can occasionally climb ramps and stairs, and never
> climb ladders, ropes, or scaffolds. She is able to perform simple, routine tasks.

Tr. 26. Because of these limitations, the ALJ concluded that Plaintiff could not perform her past relevant work as a home attendant and insurance clerk/receptionist. Tr. 30. But at step five the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as "office helper," "parking lot attendant," and "router." Tr. 31. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 31.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff contends that the ALJ erred by: (1) improperly rejecting Plaintiff's subjective symptom testimony; (2) improperly discounting the opinions of Plaintiff's treating physicians

Dr. Boggs, Dr. Yates, and Dr. Cole; and (3) improperly discounting the lay witness testimony of Karen A., Plaintiff's mother. Pl. Br. 12–13, ECF 14. This Court agrees.

## I.    Subjective Symptom Testimony

Plaintiff argues that the ALJ erred in discounting her subjective symptom testimony. The ALJ is responsible for determining credibility.  *Vasquez*, 572 F.3d at 591.  In assessing a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929. The first stage is a threshold test in which the claimant must present objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008). At the second stage of this analysis, absent affirmative evidence of malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. *Carmickle v. Comm'r Soc. Sec. Admin*, 533 F.3d 1155, 1166 (9th Cir. 2008); *Lingenfelter*, 504 F.3d at 1036.

The ALJ must make findings that are sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015). Factors the ALJ may consider when making such determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in the testimony. *Ghanim*, 763 F.3d at 1163; *Tommasetti*, 533 F.3d at 1039. In addition, conflicts between a claimant's testimony and the objective medical evidence in the record can undermine a claimant's credibility. *Morgan v. Comm'r Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

When the ALJ's credibility findings are supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). However, a general assertion that plaintiff is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *see also Morgan,* 169 F.3d at 599.

Prior to her alleged onset date, Plaintiff worked for 14 years as a referral and prior authorization coordinator for a family physician. Tr. 53, 55. Plaintiff testified that she had both mental and physical problems that kept her from continuing to work. Tr. 58–60, 63. She had pain in her neck, shoulders, and arms. Tr. 63. She found it difficult to look at a computer screen and type for long periods. Tr. 64. Her fingers would get stiff, and she would develop headaches and migraines. Tr. 64. She fell asleep at work. Tr. 64. She had trouble focusing, counting money, keeping up, and staying organized. Tr. 58, 65. Around the time of her onset date, she was also experiencing problems in her personal life. She lost three family members, was going through a divorce, and had to move in with her parents. Tr. 58–59. Her mental health practitioner recommended she return to work on a part-time basis, but she was told by her employer that it was a full-time position. Tr. 59. She said she was let go shortly after trying to return to full-time work. Tr. 59.

At the time of the hearing, Plaintiff was working as a part-time caretaker in the private home of a 93-year-old woman with dementia. Tr. 50. Plaintiff testified that she worked three four-hour shifts per week. Tr. 51, 64. She testified that the patient "still [got] around pretty good by herself" and she did not "have to do a whole lot of lifting or anything like that." Tr. 50. Plaintiff's job consisted primarily of household chores, like dishes, laundry, sweeping,

vacuuming, and emptying small trash cans. Tr. 50–52. Two other people helped the rest of the week, and the patient's son administered her medications. Tr. 51. Plaintiff testified that she sometimes fell asleep at work because of her fatigue. Tr. 50. According to Plaintiff, her employer—the patient's son—knew that Plaintiff had good and bad days and told her that she could rest at work if she needed to. Tr. 50. Plaintiff testified that she would be unable to work at this job 40 hours a week because of her multiple sclerosis and chronic pain. Tr. 65. Her legs hurt if she has to walk around for a long period of time, and she cannot focus well enough to read books to the patient to help treat her dementia. Tr. 65.

Plaintiff testified that her conditions make it difficult for her to sit for more than a half an hour at a time. Tr. 60. Standing, walking, and lying down do not always improve her pain. Tr. 60. Standing for long periods of time can cause back pain and make her legs to feel weak and wobbly. Tr. 67. She sometimes experiences vertigo. Tr. 67. Her depression and anxiety have worsened over time. Tr. 56. Plaintiff has intermittent vision problems. Tr. 56. In 2011, her right eye "greyed out," and she got spots in her left eye. Tr. 56. At the time of the hearing, Plaintiff testified that her right eye still "greyed out" a few times a month but had never caused her to stop driving. Tr. 57. Treatments for her physical pain have not cured it. Heating pads sometimes improve her pain, but her medications have not helped. Tr. 60. Her physician suggested that she try yoga, but she is too tired to do so when she gets home. Tr. 62.

Plaintiff is the custodial parent of her son, who was 12 at the time of the hearing. Tr. 48–49. It takes Plaintiff fifteen minutes to drive her son to school every day. Tr. 48. She also occasionally drives him to soccer practices and games. Tr. 48. The coach and parents of other children on his soccer team also drive him to practice and out-of-town games because Plaintiff

has difficulty sitting in the car for long periods of time. Tr. 48, 66. She tries not to drive on the weekends. Tr. 48.

Plaintiff starts a typical day by getting her son ready for school and making breakfast. Tr. 233. After taking her son to school, she tries to go on a small walk before going home to rest. Tr. 233. She then attempts to do things around the house. Tr. 233. If she has the energy, she picks her son up from school, goes to jujitsu, and returns home to eat dinner prepared by her mom. Tr. 233. She then makes sure her son does his homework, gets him ready for bed, and reads him a book. Tr. 233. Throughout the day, Plaintiff does dishes, laundry, mows the lawn, empties the trash, and cleans. Tr. 235. It can take her five hours because she has to stop and rest. Tr. 235.

Plaintiff can prepare breakfast and lunch, which typically consist of cereal, sandwiches, and pre-made meals. Tr. 234. She only makes dinner two or three times a month because she is too weak or tired after work to cook dinner. Tr. 234. Plaintiff cares for a pet dog by providing it with food and water. Tr. 233. Her father sometimes helps care for the dog. Tr. 233. Plaintiff uses alarms to remind her to take care of her personal needs and medications. Tr. 234. She struggles with some personal needs because weakness and pain in her arms make it difficult for her to care for her hair and put clothing on. Tr. 234.

Plaintiff shops in stores for food, clothing, and personal items about once a month for an hour or so. Tr. 235. Though it is more difficult for Plaintiff now and she struggles with organization, Plaintiff is still able to handle money and pay bills. Tr. 236. Plaintiff's hobbies include fishing, hiking, biking, walking, and spending time with her son, but she only does these things two or three times a month because she is tired, weak, and in pain. Tr. 236. As a result of her pain and fatigue, she is short-tempered and does not handle stress well. Tr. 237–38. She has a hard time lifting more than 10 pounds and walking more than 20 minutes. Tr. 237. She can pay

attention for up to an hour but has to reread written instructions and will forget spoken instructions. Tr. 237.

The ALJ provided three reasons for discounting Plaintiff's subjective symptom testimony: (1) Plaintiff's activities of daily living; (2) evidence Plaintiff stopped working for reasons unrelated to her disability; and (3) the objective medical evidence. Tr. 27–28. These reasons are neither clear nor convincing.

A.      Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti*, 533 F.3d at 1039.  There are two grounds for using daily activities to form the basis of an adverse credibility determination: (1) when activities meet the threshold for transferable work skills and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). However, "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998), and "the mere fact that a plaintiff has carried on with certain daily activities, such as grocery shopping . . . does not in any way detract from his credibility," *Webb v. Barnhart,* 433 F.3d 683, 688 (9th Cir. 2005) (citing *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001)). In order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick,* 157 F.3d 722. The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to reach his conclusion on the claimant's credibility. *Id.* at 722–23.

The ALJ found that "[t]he claimant has reported activities of daily living that are inconsistent with a finding of disability." Tr. 28. Specifically, he emphasized that Plaintiff was "the full-time custodial parent to her son, which can be demanding, both physically and

mentally." Tr. 28. He noted that Plaintiff drives her son to school and attends his sporting events. Tr. 28. The ALJ also cited Plaintiff's ability to do some household chores and work part-time as a caregiver for an elderly patient with dementia. Tr. 28. Such activities, the ALJ reasoned, "are not what one would expect from a completely disabled individual." Tr. 28.

Here, however, substantial evidence does not support the ALJ's characterization of the record. Though Plaintiff is the custodial parent to her 12-year-old son, she also cited limitations in her caretaking abilities. Plaintiff drives her son to school, which is located only fifteen minutes from her home, and takes him to local soccer practices and games. Tr. 48. Because she has difficulty sitting in the car for long periods of time, other parents or the coach also take her son to practice and out-of-town games. Tr. 48, 66. Plaintiff only prepares simple meals—such as cereal, sandwiches, and pre-made meals—and relies on her mother to prepare dinner because Plaintiff is too tired to do so. Tr. 233–34. These activities do not conflict with Plaintiff's alleged limitations, which include sitting for thirty minutes at a time, difficulty standing for long periods, fatigue, and difficulty focusing. Tr. 58, 60, 67. Thus, the ALJ's finding is not supported by the evidence in the record, which demonstrates that—consistent with her alleged symptoms—Plaintiff is limited in her activities and must rely on others for help.

The ALJ has similarly mischaracterized Plaintiff's testimony about her ability to do housework and work with an elderly patient with dementia. In Plaintiff's activity report, she noted that household chores take her hours to complete because she needs to stop and rest. Tr. 234–35. As noted above, Plaintiff's ability to prepare meals is limited. Similarly, Plaintiff only shops for groceries and personal items about once a month for an hour or so. Tr. 235. Though Plaintiff works three four-hour shifts a week doing household chores for an elderly woman, Plaintiff can rest as she needs and, on occasion, has fallen asleep at work because of her fatigue.

Tr. 50. She also testified that the patient still "gets around pretty good by herself" and the job does not require much lifting. Tr. 50–52. Other individuals contribute to the patient's care, and the patient's son administers medications. Tr. 51. Plaintiff also testified that she would be unable to work at this job full-time because her pain limits her physically and prevents her from focusing well enough to contribute to the woman's care. Tr. 65. Once again, when read in context, these statements are consistent with Plaintiff's testimony.

In sum, contrary to the ALJ's finding, the record shows that Plaintiff's activities are not inconsistent with a finding of disability in this case. Accordingly, this is not a clear or convincing reason for rejecting Plaintiff's subjective symptom testimony.

B.    Reason Stopped Working

The ALJ may consider work that a claimant engaged in—regardless of whether that work amounted to substantial gainful activity—in making his disability determination. SSR 16-3 (prior work and efforts to work are factors used to evaluate a claimant's credibility); *see also* 20 C.F.R. §§ 404.1571, 416.971 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."). "In weighing a claimant's credibility, the ALJ may consider inconsistencies . . . between his testimony and . . . his work record . . . ." *Light v. Soc. Sec. Admin.* 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may also discount a claimant's credibility where the alleged impairment is not the reason that the claimant stopped working. *See Tommasetti*, 533 F.3d at 1040 (affirming credibility decision where the claimant testified his diabetes was not disabling, was controlled by medication, and was not the reason he stopped working); *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (The plaintiff's pain allegations were not credible where the plaintiff reported at the hearing and a doctor that he left the job because he was laid off, not because he was injured.). And the ALJ

may discount a claimant's credibility where he or she has continued to search for work as holding one's self out as capable of work "cast[s] doubt on a claim of disability." *See Ghanim,* 763 F.3d at 1165

Here, the ALJ found that evidence in the record "that the claimant stopped working for reasons not related to her allegedly disabling impairments," which "strongly suggests that the claimant stopped working because her boss retired, not because her symptoms were limiting." Tr. 28. The basis for the ALJ's conclusion is an August 14, 2014 chart note from a Dr. Young in which Plaintiff reported she would soon lose her job and insurance because the physician she worked for was retiring. Tr. 28.

This single chart note, however, is not substantial evidence. *See e.g. Popa v. Berryhill*, 872 F.3d 901 (9th Cir. 2017) ("A single discrepancy fails, however, to justify the wholesale dismissal of a claimant's testimony."). This appears to be the sole instance in the record where Plaintiff attributes the end of her employment to the retirement of her supervising physician. At the hearing, Plaintiff testified that she stopped working because of her physical and mental impairments. Tr. 58, 63. She noted that she worked for a new physician during final month of her employment and could not keep up with the new demands and stress of the job. Tr. 53–54 Plaintiff reported to health care providers that she had difficulties at work because of her impairments. Tr. 424 (2013 chart note reflecting difficulty keeping up with work due to memory and attention deficits and chronic pain), 895 (reports problems at work and physician provides letter for patient recommending FMLA), 897 (notes difficulty returning to work), 901 (notes attempt to return to work part time), 902 (reports employer told her she could not return on a part-time basis; physician opines that plaintiff could not return to work full-time). She also attributed her inability to work to her impairments in documents filed with the Social Security

Administration. Tr. 242 (Disability Report indicates that she stopped work because of difficulties with memory, concentration, brain fog, weakness, and fatigue). In the year before Plaintiff stopped working, she took medical leave on multiple occasions. Tr. 301, 302. Thus, considering the record as a whole, the ALJ's finding that the "evidence strongly suggests that the claimant stopped working because her boss retired, not because her symptoms were limiting" is not supported by substantial evidence.

      C.      Objective Medical Evidence

The ALJ is instructed to consider objective evidence in considering a claimant's symptom allegations. 20 C.F.R. § 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms[.]"). Inconsistency between Plaintiff's testimony and the objective medical record is a valid reason to discount Plaintiff's testimony. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (affirming the ALJ's credibility finding where the plaintiff's testimony of weight fluctuation was inconsistent with the medical record). The ALJ may also take into account the effectiveness of any medication. *See Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995) ("Factors that the adjudicator may consider when making such credibility determinations include the . . . effectiveness or adverse side effects of any pain medication."). And under certain circumstances, the ALJ can discount claimant testimony when that testimony is not supported by the objective medical record. *See Batson,* 359 F.3d at 1196 (9th Cir. 2007) ("'Graphic and expansive' pain symptoms could not be explained on objective, physical basis by claimant's treating physician."); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (The ALJ could consider mild findings on MRIs and X-rays in discounting the plaintiff's testimony as to her back pain.). However, this may not be the ALJ's sole reason for discounting a claimant's

testimony: "the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick,* 157 F.3d at 722.

In this case, the ALJ found that the objective record does not support Plaintiff's symptom testimony. First, the ALJ found that Plaintiff's multiple sclerosis has remained stable and that her neurological records have indicated mild findings that are not consistent with any progression of her condition. Tr. 27–28. Second, the ALJ emphasized that there are limited records related to Plaintiff's fibromyalgia and that records reflect that she had a normal gait and "normal painless range of motion without synovitis, effusion, deformity, or instability." Tr. 28. The ALJ also noted that Plaintiff was able to work with symptoms of joint pain since her 20s, rendering her complaints of disabling pain less persuasive. Tr. 28. Finally, the ALJ noted mental health records reflect that her depression was "under good control" and suggested that her "mental health issues were related to life circumstances and were periodic." Tr. 28.

Because a lack of support from the objective medical evidence is the sole remaining reason the ALJ provided for discounting Plaintiff's testimony, this alone cannot serve as the basis for discounting Plaintiff's subjective symptom testimony. *See Reddick*, 157 F.3d at 722. In addition, the ALJ's reasoning as to the objective medical evidence is neither clear nor convincing. As this Court has previously held, stability of a condition does not undermine a plaintiff's allegations as to the intensity, persistence, or limiting effects of the symptoms of a condition. *See, e.g., Timothy S. v. Comm'r, Soc. Sec. Admin*., No. 6:17-CV-02043-HZ, 2019 WL 2006689, at *5 (D. Or. May 3, 2019) ("[T]he stability of Plaintiff's symptoms does not indicate that the pain is resolved, only that it is not getting worse."); *Kirk M. v. Comm'r, Soc. Sec. Admin*., No. 6:17-cv-01663-HZ, 2018 WL 6651525, at *4 (D. Or. Dec. 19, 2018) (finding that a

plaintiff's stable glaucoma did not mean the plaintiff was no longer visually impaired); *Kimberly S. v. Comm'r, Soc. Sec. Admin.*, No. 3:17-cv-01956-HZ, 2018 WL 6198275, at *6 (D. Or. Nov. 28, 2018) (finding that a plaintiff's stable mood was unrelated to the opinion of a nurse practitioner that the plaintiff had marked limitations).

Similarly, Plaintiff's normal painless range of motion, normal gait, and strength do not cast doubt on the credibility of Plaintiff's testimony regarding her fibromyalgia, particularly in light of the tender points in her shoulders, elbows, wrists, hands, hips, knees, ankles, and feet, which constitute objective evidence of fibromyalgia. Tr. 440; *see also* SSR 12-2, 2012 WL 3104869 (July 25, 2012) (noting positive tender points can establish fibromyalgia); *Revels v. Berryhill*, 874 F.3d 648, 663 (9th Cir. 2017) ("[A] person with fibromyalgia may have "muscle strength, sensory functions, and reflexes [that] are normal."). And, while Plaintiff may have experienced joint pain in her twenties, she also began experiencing the symptoms of what was ultimately diagnosed as multiple sclerosis in 2012. Tr. 464 (physician notes possible Susac syndrome). It was after this point that Plaintiff began having difficulty at work. Tr. 424 (reports during a neuropsychological evaluation in early 2013 that she was struggling at work). Plaintiff's prior capacity to work despite her symptoms of fibromyalgia is not a clear or convincing reason for discounting Plaintiff's testimony as to her symptoms and limitations now when she is suffering from multiple physical and mental impairments.

Further, Plaintiff's mental health records around the end of her employment reflect severe symptoms of depression, including suicidal ideation. Tr. 893–902. Dr. Cole—Plaintiff's treating psychologist at the time—also noted difficulties with memory at almost all of Plaintiff's appointments. Tr. 893, 896, 898–902. Thus, the ALJ erred in discounting Plaintiff's subjective symptom testimony.

## II. Medical Opinion Evidence

Plaintiff contends that the ALJ erred in rejecting the opinions of three of Plaintiff's treating physicians: Jerry Boggs, MD; Jeff Cole, PhD; and Bryan Yates, MD. Pl. Br. 14. There are three types of medical opinions in social security cases: those from treating, examining, and non-examining doctors. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of an examining physician over that of a reviewing physician. *Id*. If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may reject it only for clear and convincing reasons. *Id.*; *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. However, the ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

### A. Jerry Boggs, M.D.

Dr. Boggs is Plaintiff's treating neurologist. Plaintiff first began seeing Dr. Boggs in May of 2015. Tr. 1040. The record shows that Plaintiff had four appointments with Dr. Boggs prior to his September 22, 2016 evaluation. Tr. 1022–30, 1044. He diagnosed Plaintiff with multiple sclerosis, signs of which were evident on exam and MRI. Tr. 1040–41. He described Plaintiff's symptoms as "severe fatigue, poor muscular endurance and energy, numbness, tingling, generalized pain, weakness, stiffness, [and] muscle spasms." Tr. 1041. However, he also noted that there were "no physical exam findings that corroborate with symptoms" and "many of her symptoms are attributable to fibromyalgia." Tr. 1041.

Dr. Boggs wrote that Plaintiff claimed the need to lie down and rest for 45 minutes to an hour several times a day. Tr. 1041. He opined that Plaintiff could walk one to two city blocks without rest or significant pain, sit for thirty minutes, stand for twenty to thirty minutes, sit for two hours in an eight hour day, stand or walk for one to two hours in an eight hour day, and would require a job that allowed her to shift positions. Tr. 1042. He also found that she would need to take unscheduled 20-minute breaks every hour to an hour and a half. Tr. 1043. He opined that Plaintiff could occasionally lift up to twenty pounds and never lift fifty pounds. Tr. 1043. He also stated that Plaintiff had some fingering, reaching, and handling limitations and would need to take breaks after she used her hands to perform handling or fingering. Tr. 1043. Finally, Dr. Boggs found that at least four days per month Plaintiff would be unable to maintain a regular work schedule. Tr. 1044.

The ALJ gave Dr. Boggs's opinion limited weight because: (1) Dr. Boggs indicated claimant would need a job that allowed shifting positions at will, but Plaintiff testified at the hearing these would not help her symptoms; (2) "it appear[ed] he relied heavily upon the claimant's self-reported symptoms, which are not consistent with the clinical findings; (3) there was no indication the claimant missed any work from her current part-time job; and (4) Dr. Boggs had "only seen the claimant a few times." Tr. 29. These reasons are neither specific nor legitimate.

First, contrary to the ALJ's suggestion, Dr. Boggs's opinion that Plaintiff needed to shift positions at will is not inconsistent with Plaintiff's testimony. Dr. Boggs indicated that Plaintiff would need a job that permitted shifting positions at will from sitting, standing, or walking. Tr. 1042. However, Dr. Boggs did not opine that Plaintiff could work a full-time job if she had the option of sitting or standing at will. Rather, Dr. Boggs wrote that Plaintiff could only walk one to

two blocks without pain or rest, could sit for thirty minutes at a time and walk for only twenty to thirty minutes at a time, and could sit two hours in an eight-hour day and stand or walk one to two hours in an eight-hour day. Tr. 1042. He also indicated that Plaintiff would need to take twenty-minute unscheduled breaks every 60-90 minutes and rest every 45-60 minutes. Tr. 1041, 1043. This is consistent with Plaintiff's testimony that she would not succeed in a job with a sit/stand option. Tr. 67. She testified that she cannot sit for more than a half hour at a time and usually ends up laying down to feel better. Tr. 60. Though standing, walking, and stretching sometimes alleviates her pain, tr. 60, standing and walking for long periods of time also exacerbate her pain, tr. 65, 67.

Second, as noted above, the ALJ erred in discounting Plaintiff's subjective symptom testimony as inconsistent with the clinical findings. *See supra* Part I(C). Dr. Boggs' records reflect Plaintiff's complaints of pain with walking and activity, poor muscle endurance and hemiparesis, and fatigue that was "unrelenting in nature" and worsens as the day goes on. Tr. 1022–23, 1025, 1028. At their first appointment, Plaintiff also endorsed waxing and waning numbness and tingling paresthesia, urinary urgency and occasional incontinence, and paroxysmal shooting pain. Tr. 1035. Dr. Boggs indicated that Plaintiff likely had multiple sclerosis based on her history and abnormal findings on her MRI. Tr. 1022, 1029. Though her multiple sclerosis was not progressing and there were no symptoms of relapse, he noted she had "other complicating illnesses" that made it difficult to determine what was caused by the multiple sclerosis and what was fibromyalgia. Tr. 1022. Without further explanation from the ALJ, the Court cannot determine how Plaintiff's self-reports are inconsistent with these clinical findings. *See Regenniter v. Comm'r of Soc Sec. Admin.*, 166 F.3d 1294, 1299 (9th Cir.1999) ("To say medical opinions are not supported by sufficient objective findings or are contrary to the

preponderant conclusions mandated by the objective findings does not achieve the level of specificity that our prior cases have required."). The ALJ's failure to explain how Dr. Boggs's opinion is inconsistent with the clinical findings cannot constitute a specific and legitimate reason for rejecting Dr. Boggs' opinion.

Third, Plaintiff's ability to work three four-hour shifts per week does not undermine Dr. Boggs' finding that Plaintiff would miss four or more days per month if she were to try to work eight hours a day, five days per week with normal breaks. Indeed, the record shows Plaintiff struggles with her part-time job and can rest on the job as needed. Tr. 50. Thus, Plaintiff's lack of absences in her limited caretaking position does not reasonably cast doubt on Dr. Boggs' opinion that she would miss work when faced with a more demanding job.

Finally, though the ALJ "may properly consider the length of treatment and the frequency of examinations in assessing what weight to give a treating source's opinion," the ALJ cannot reject Dr. Boggs' opinion solely because he has "only seen Plaintiff a few times." Tr. 29; *see e.g. Grayson v. Astrue,* No. 2:11-CV-1656-EFB, 2012 WL 4468406, at *5 (E.D. Cal. Sept. 25, 2012) ("The presence of a limited treatment relationship, however, cannot alone constitute a clear and convincing reason for rejecting a treating source's opinion. To hold otherwise would render the opinion of an examining physician worthless."). Dr. Boggs saw Plaintiff four times over a period of fifteen months. Tr. 1022–38. Three of these visits indicate that "extensive counseling was performed." Tr. 1023, 1026, 1029. At the first visit, Dr. Boggs reviewed two prior MRI's and a cerebrospinal fluid analysis in depth and ordered a third MRI, which was later also "reviewed in depth." Tr. 1029, 1038. In light of the time Dr. Boggs—a neurologist—spent with Plaintiff and reviewing the objective medical evidence, the ALJ's suggestion that Dr. Boggs's treatment of Plaintiff was limited is not support by the record. *See e.g. Faigen v. Astrue*, No. 3:11-CV-00219-

JE, 2012 WL 2813971, at *12 (D. Or. June 7, 2012), *report and recommendation adopted*, No. 03:11-CV-219-JE, 2012 WL 2813882 (D. Or. July 10, 2012) (reversing the ALJ's decision to reject a physician because he "had only a brief treatment history" with the plaintiff where the physician had "repeated contacts with [the plaintiff] examined her, and had the opportunity to review her medical records, treatment notes, and X-rays"). Accordingly, the ALJ erred in rejecting Dr. Boggs's opinion.

B.    Dr. Cole

Dr. Cole was Plaintiff's treating psychologist for a period of six months in 2013 and 2014. Tr. 887–902. Dr. Cole saw Plaintiff approximately ten times during this period. Tr. 893–902. On January 1, 2014, Dr. Cole provided a short-term disability claim form to Plaintiff's disability insurance provider. Tr. 904. Dr. Cole indicated that, due to Plaintiff's multiple sclerosis and psychosocial stressors, Plaintiff had developed "serious depression symptoms that have impacted her daily functioning to the point that she is too sad, tearful, emotionally reactive, and unable to cope with minor stressors that she cannot function in the work environment." Tr. 904. He opined that Plaintiff met the criteria for major depressive disorder "based on her self-report" and "presents as stated." Tr. 904. A week later, Dr. Cole provided Plaintiff with a letter indicating that she would be absent from work unitl her condition stabilized. Tr. 905. He recommended to Plaintiff that she take medical leave "so she [could] get the treatment she needs." Tr. 895.

On April 1, 2014, Dr. Cole provided a "fitness for duty release" that cleared Plaintiff for transitional duty for a few weeks, during which Dr. Cole recommended that Plaintiff work five hours per day for one week, then six hours per day for the second week, an then full time. Tr. 304. He also recommended that she be allowed to take brief breaks as needed during the

workday. Tr. 304. On May 1, 2014, Dr. Cole indicated in a chart note that Plaintiff would be unsuccessful at returning to work full-time due to her physical health condition and that her mental health condition would continue to deteriorate in that environment. Tr. 902 ("Based on this becomes clear that she will not be able to return to work full time."). On May 30, 2014, Dr. Cole provided another release for work to Plaintiff's employer indicating that Plaintiff could return to full duty on June 2, 2014, with accommodations. Tr. 308. Specifically, she would need frequent brief breaks, the ability to get up and move, and written instructions from her supervisor to help her stay focused. Tr. 308.

The ALJ gave most of Dr. Cole's opinion as to Plaintiff's inability to return to work no weight because his diagnosis of depression was "apparently" based on Plaintiff's self-report and because his opinion appears to be based largely on Plaintiff's multiple sclerosis diagnosis, which is outside his area of expertise. Tr. 29. However, he gave the earlier opinion that claimant could return to work in 2014 significant weight "because it is consistent with the record as a whole." Tr. 29.

The ALJ erred in discounting Dr. Cole's opinion. First, the ALJ cannot reject the opinion of a mental health practitioner merely because they appear to be subjective. *See Buck v. Berryhill,* 869 F.3d 1040, 1049 (9th Cir. 2017) ("The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology."). And, as noted above, the ALJ erred in discounting Plaintiff's subjective symptom testimony as inconsistent with the objective clinical evidence and observations. *See supra* Part I(C). Dr. Cole's records reflect Plaintiff's depressed mood and difficulties with memory, including slow speech and slow processing. Tr. 893–902. The chart notes also demonstrate that Plaintiff

struggled with suicidal ideation throughout her time in treatment with Dr. Cole. Tr. 893, 895–896. Dr. Cole additionally opined in his letter that Plaintiff "presented as stated." Tr. 904.

Second, the ALJ incorrectly asserted that Dr. Cole's opinion was based largely on Plaintiff's multiple sclerosis diagnosis and not on her psychological impairments. Though "the regulations give more weight to . . . the opinions of specialists concerning matters relating to their specialty over that of nonspecialists," *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001), this is not a situation where a mental health practitioner rendered an opinion about limitations from a physical impairment. Rather, Dr. Cole diagnosed Plaintiff with "serious depression" that had developed due to Plaintiff's multiple sclerosis and numerous psychosocial stressors. Tr. 904. He opined that because of her depression she was "too sad, tearful, emotionally reactive, and unable to cope with minor stressors" such that "she [could not] function in the work environment." Tr. 904. In other words, Dr. Cole's opinion was within his area of expertise as a psychologist. *See Mays v. Carolyn W. Colvin*, No. 14-CV-05652 JRC, 2015 WL 363045, at *3 (W.D. Wash. Jan. 27, 2015) (The ALJ erred in discounting the opinion of a mental health provider where it was based in part on the plaintiff's pain. The court found that limitations from that condition—including diminished attention, concentration, and performance—were within the provider's expertise); *Aponte v. Astrue*, No. C11-5671-JCC-BAT, 2012 WL 2882988, at *4 (W.D. Wash. June 7, 2012), *report and recommendation adopted,* No. C11-5671-JCC, 2012 WL 2882751 (W.D. Wash. July 12, 2012) (the ALJ erred in discounting a doctor's opinion as outside of her expertise where the doctor diagnosed the plaintiff with a pain disorder recognized by the DSM-IV caused by both psychological factors and a general medical condition). Accordingly, the ALJ failed to provide specific or legitimate reasons for discounting Plaintiff's testimony.

C.    Dr. Yates

Dr. Yates is Plaintiff's treating psychiatrist. Dr. Yates began seeing Plaintiff in April of 2015 and diagnosed her with major depressive disorder. Tr. 962, 1021. He sees Plaintiff every two to three months and provides her with medication management. Tr. 1021.

On August 30, 2016, Dr. Yates provided Plaintiff's attorney with a letter regarding Plaintiff's mental health impairments. Tr. 1021. He described Plaintiff's symptoms of depression as "depressed mood, crying spells, tearfulness and loss of interest in things that should be enjoyable." Tr. 1021. He also indicated that she struggles with low energy, low motivation, difficulty concentrating, keeping focused, poor memory, and poor sleep. Tr. 1021. He explained that Plaintiff has experienced suicidal thoughts but made no attempts. Tr. 1021. Dr. Yates noted that it would be difficult for Plaintiff to obtain or maintain employment, especially as exacerbation of her symptoms "occurs when she is under stress and happens episodically and unpredictably." Tr. 1021. Given her symptoms, Dr. Yates opined that Plaintiff would not be able to sustain her concentration and energy enough to make it through an eight-hour day and would experience frequent absences from work. Tr. 1021.

The ALJ gives little weight to Dr. Yates's opinion. First, he notes that Dr. Yates provides no support for his opinion regarding Plaintiff's frequent absences nor any explanation of the frequency with which work would be missed. Tr. 29. Second, the ALJ emphasized Dr. Yates' short and infrequent treatment relationship with Plaintiff, which he asserts began in April of 2016 only four months before his letter was drafted. Tr. 29–30.

Here, the ALJ erred in discounting all of Dr. Yates's opinion. As described above with regard to Dr. Boggs opinion, the ALJ's reasoning that Plaintiff's ability to work part-time sheds doubt on the opinion evidence that Plaintiff would frequently miss work if she tried to work full

time is not specific or legitimate. *See supra* Part II(A). Similarly, the record does not support the ALJ's decision to discount Dr. Yates's opinion because of their short treatment relationship. The ALJ erroneously asserts that Dr. Yates began seeing Plaintiff in April of 2016 when the record shows that Plaintiff's treatment began a year earlier in April of 2015. Tr. 962. Plaintiff saw Dr. Yates at least six times in the sixteen months before Dr. Yates drafted his letter. Tr. 921–66.

However, the ALJ did not err in discounting Dr. Yates's specific opinion that Plaintiff would miss work "frequently." Though Dr. Yates did explain that Plaintiff would miss work because of her fatigue and difficulty concentrating, he did not provide an explanation for how frequently work would be missed:

> I do not believe she would be able to sustain her concentration and energy levels enough to consistently make it through an 8 hour work day. I would expect frequent absences from work due to her mental health symptoms that would be far more than any employer would tolerate.

Tr. 1021. Without more, it was reasonable for the ALJ to conclude that this ambiguous limitation should be given little weight. Thus, while the ALJ erred in giving Dr. Yates's opinion little weight overall, the ALJ provided a specific and legitimate reason for discounting Dr. Yates's opinion as Plaintiff's frequent absences from work.

## III.    Lay Witness Testimony

Plaintiff argues that the ALJ erred in discounting the lay witness testimony of Plaintiff's mother, Karen A. Pl. Br. 26. Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina*, 674 F.3d at 1114. The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses. *Valentine,* 574 F.3d at 694. The ALJ is not required, however, "to discuss every witness's testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114. If the ALJ gives valid germane reasons for rejecting testimony from

one witness, the ALJ may refer only to those reasons when rejecting similar testimony by a different witness. *Id.* Additionally, where "lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony," any error by the ALJ in failing to discuss the lay testimony is harmless. *Id.* at 1117, 1122.

The ALJ gave Karen's opinion partial weight. He assigned great weight to her report that Plaintiff prepared meals, took her son to school, and had difficulty focusing and paying bills because it was consistent with the claimant's reported symptoms and activities. Tr. 30. However, he gave limited weight to the check-box portion of the form, where Karen indicated that Plaintiff had difficulties with all of the listed physical and mental abilities. Tr. 30. The ALJ found— without discussion—that these limitations were not consistent with information found elsewhere on the form. Tr. 30.

It is not immediately apparent how the check-box portion of the form is inconsistent with information found elsewhere in the form. Karen's report is largely consistent with Plaintiff's own report. Karen noted Plaintiff has difficulty with memory and focus. Tr. 263, 265. She also noted difficulty with sitting for more than thirty minutes as a well as squatting, bending, standing, walking, lifting, and reaching because of her pain. Tr. 265. Consistent with these limitations, Karen observed difficulties in many activities of daily living. Her third-party function report reflects Plaintiff's limited abilities in cooking, cleaning, grocery shopping, and driving her son to school and sports. Tr. 261–63. Karen wrote that she and Plaintiff's father help Plaintiff by taking care of the dog, cooking dinner, picking up her son from school, grocery shopping, and doing laundry. Tr. 261. They remind her to pay bills. Tr. 263. She has observed Plaintiff's struggle with fatigue. She wrote that, on the days she works, Plaintiff is exhausted and will return home, nap,

eat dinner, and return to bed. Tr. 261. Without further explanation as to how the form is internally inconsistent, the Court cannot find that the ALJ's reasoning was a germane reason to discount this portion of the lay witness testimony. Accordingly, the ALJ erred in giving Karen's testimony partial weight.

## IV.    Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the Court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). To determine which type of remand is appropriate, the Ninth Circuit uses a three-part test. *Id.* at 1020; *see also Treichler v. Comm'r*, 775 F.3d 1090, 1100 (2014) ("credit-as-true" rule has three steps).  First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020.  Second, the record must be fully developed, and further administrative proceedings would serve no useful purpose. *Id.*  Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled.  *Id.*  To remand for an award of benefits, each part must be satisfied.  *Id.*; *see also Treichler*, 775 F.3d at 1101 (When all three elements are met, "a case raises the 'rare circumstances' that allow us to exercise our discretion to depart from the ordinary remand rule."). The "ordinary remand rule" is the proper course except in rare circumstances. *Treichler*, 775 F.3d at 1101.

Here, the Court finds that the ordinary remand rule is appropriate. There is some conflict and ambiguity in the opinions of the treating physicians. For example, as discussed above, Dr. Yates opines with little explanation that Plaintiff would miss work "frequently." Tr. 1021. By comparison, Dr. Boggs opines Plaintiff would miss work more than four days per month. Tr. 1040. Further, Dr. Boggs's opinion conflicts with that of the stage agency physicians. *Compare*

tr. 88, 103 (limiting Plaintiff to sitting and standing six-hours in an eight-hour day) *with* tr. 1042 (limiting Plaintiff to sitting and standing two hours in an eight-hour day). Accordingly, this case is reversed and remanded for further proceedings.

## CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED for further administrative proceedings.

IT IS SO ORDERED.

Dated this ___10___ day of ___July___, 2019.

MARCO A. HERNÁNDEZ
United States District Judge